Good afternoon, our first case is Thomas. And I'm going to, as a question, tell me how you pronounce his name. I notice there's an umlaut here. I'm really shaky on this. Skold. Skold, all right, okay, that's easy enough. Versus Galderma Laboratories. Numbers 173148 and 173231. Counsel. Good afternoon, Your Honor. Good afternoon. Your Honor, counsel. And I'd ask the crier, with your permission, if I could reserve three minutes for a rebuttal. That'll be granted. Thank you. Your Honor, Thomas Skold is a Swedish citizen who developed a skin moisturizer, and he invented the name Restoraderm to describe both the product and the technology underlying the product. The jury found that Skold is the rightful owner of the trademark. The jury found that. Can I ask you about that? Sure. Because I think it would help if we went straight to that issue. In their reply brief, your opposing counsel point out that you in the responsive brief, this is a four-step brief, in your reply slash response brief, you actually describe the delivery of the trademark as a transfer, not as a license, but as a transfer. And the document itself at page 1465, if I'm remembering correctly, of the joint appendix, has this language that they point to and rely on heavily. They pointed to it in the court below, and I'd like you to address it if you would. This is section 4.2.1 of the 2002 agreement. It says all trademarks applied for or registered, including Restoraderm, shall be in the sole name of Colgenyx and be the exclusive property of Colgenyx during the term and thereafter. What are we to make of that language if it is not a full transfer of rights? Well, your Honor, that was a hotly contested issue of the trial court. The parties introduced evidence of the intent behind that language. The jury found that the language meant that if the contract were to be terminated, the trademark was to be returned to Mr. Skold. Yeah, when you say that was hotly contested and there was evidence, doesn't there have to be some ambiguity before you go behind the language of the document itself? Well, the fact that there was a contested interpretation of what the language meant, we argued it was clear in the summary judgment papers, and the trial judge below allowed there to be testimony about that, and the jury resolved it. Help me find the ambiguity. If it says it's to be, quote, the exclusive property of Colgenyx during the term and thereafter, what do you rely on to say that that means something other than it's the exclusive property of Colgenyx going forward? Like when you say during the term and thereafter, it looks like that's a statement of this is a transfer of the marks, period. What is it that you were pointing to in the court below and appointed to for us that would allow us to read that language and say, hey, wait a second, there's a license here. And, in fact, licensee estoppel should apply because there's a license. Or there was some sort of a reversion. Well, there were two development agreements. The first one using the more aggressive transfer language. The second one is the one that superseded the first one and had the language that said Mr. Skoll should get back the trademark if and when the agreement were ever terminated. Okay, and that's what I'm trying to get at. I know that's your argument. What is it in the 2004 agreement that says that thing we said in the 2002 agreement? It's different now. This is not to be Colgenyx's exclusive property during the term and thereafter. Something different is going to happen. Well, in the subsequent agreement, the second agreement, specifically says that it supersedes all prior agreements. Okay. So the trial judge properly concluded that the first agreement was no longer in effect. Okay. So what was argued to the jury was the terms of the second agreement. All right. And what is it in the 2004 agreement? Something about the transfer of goodwill. Is that it? What are you pointing to in the 2004 agreement? Yes, it's the transfer of goodwill. And based on case law, the suggestion is trademark intellectual property can be included in the term goodwill. Mr. Skold testified that that was the intention of the agreement, and the jury agreed with that. Okay. So right now, we are – I mean, the jury clearly found that Skold is the rifle owner, and that's – there's no question about that. The jury also found that Galderma's continued use of the trademark was false and misleading and that it was outrageous what they were doing. The false and – I'm sorry. Go ahead. The false and misleading. I mean, that's just terms of art to talk about. I mean, it looks like what the jury found is – because they also found there wasn't going to be a substantial portion of the public misled – that they were saying this is a deceptively misleading trademark, which is a kind of a mark that's protectable, right? You get secondary meaning in a deceptively misleading trademark, and under Section 2, if you show your – the Lanham Act, if you show you've developed secondary meaning, that's a kind of mark that can get registered and is protectable. Isn't that right? That is right, Your Honor, but in this case, we had two different things going on. One is that – I mean, think of the original agreements, the two agreements with Colligenics, were essentially joint venture agreements. They were development agreements. Right. So that when it was agreed that Colligenics would be the party in whose name the trademark would be registered, it was also inuring to the benefit of Mr. Skoll because he was going to be benefiting along with Colligenics in the development and sale of products using that trademark. So at the end of the day, when we're talking about use of the product, there is no question that the evidence showed that Mr. Skoll used the trade name, the Restoraderm trademark, multiple times in attempting to shop it and his product and his technology within the dermatological and pharmaceutical industries. You want to address their argument that those were not uses in commerce, right? Because their assertion is you can write all the papers you want, and that's not a use in commerce. You can talk to people at trade shows, and that's not a use in commerce. A use in commerce is a bona fide use on a good or a service. Well, the use in commerce question, I mean, obviously the congressional language in the statute says in commerce. It doesn't say to public consumers. So and the case law around the country, including in this circuit, has said that in commerce doesn't necessarily require the sale of goods to the public. There are cases that suggest that the sale of the marketing and sale of goods to professionals within an industry is sufficient. So that the segment of commerce. So are you relying on what an analogous use theory here? I don't believe it's analogous. It's it's it's it's direct use. It's use. I mean, look, look at it from this standpoint. What Mr. Skoll did was he did. He used it every way he possibly could to achieve the ultimate goal of marketing a product with that name. He developed samples used with the name on it. Hundreds of containers of his product. He went to trade shows. He published papers about it. He met many number of pharmaceutical companies to try to market. And he finally found Collagen X who wanted to be his joint venture partner. And then he continued along with Collagen X to one register the mark. And then to be registered in Collagen X's name. And according to the terms of the 2002 agreement, it's clear that he allowed to use the mark. But Collagen X owns the mark. And then that was superseded by the later agreement that said, yes, Collagen X would continue to be the owner of the mark unless and until the agreement was terminated, which it was. And since Galdermo acquired Collagen X, they were bound by those terms. And that's what the jury found. I don't think there's there. There should be any question that the case law is clear that it doesn't require that there be a competing product on the drugstore shelves. In order for there to be trademark protection here and in two respects. One is we were talking about the fact that he used the mark consistently, aggressively and frequently in dealing with the dermatology, pharmaceutical industry that the case laws find is sufficient. Hold up for a second. You say consistently and aggressively. When the when the district court went through what had been happening, there were papers that were written. You're not. Are you asserting that writing academic papers constitutes a use in commerce? Yes. Academic papers are used in commerce. Do you have any authority for that at all? Well, no, no. Because there is no authority, right? Because there's no authority on that particular point. But but let's look at the common sense of it. The common sense of it is that if if somebody what constitutes marketing, obviously, you know, a billboard using the name is used in commerce. Well, and if the audience conferences that he went to right where you say he he had samples and he affixed the name to the samples and he gave the samples to people. I mean, that looks like marketing. Well, but think of marketing to a segment of the community that involves people who read journals. That is marketing. If you're talking about your product, the qualities are your product, the name of your product, the name of your technology in a journal where the audience are the professionals that I think common sense would say that is equally marketing. It's use of the name in commerce because it's trying to develop generate interest in the product. OK, where were these conferences held where he was distributing samples? Well, there was only one conference that he attended in the Caribbean. Where in the Caribbean? I don't remember which island it was. Was there something in Puerto Rico? It may have been Puerto Rico. Yes. OK, so because that's a territory of the United States, does that count as use in commerce in the United States? I would I would suggest yes, of course. Because, again, the purpose of using the samples, the purpose of talking about them at conferences, the purpose of meeting individuals, the purpose of going to Johnson and Johnson and and Bayer and other companies to try to to develop interest in finalizing and marketing his product is essentially advertising. He's attempting to to commercialize his product that is in commerce within the broad definition that Congress intended when they just use the words in commerce. If they had meant it to be more restricted to just consumer shelves, then we would have a different case here. But that's not what Congress said. Can I ask you to switch gears a little bit? I'm interested in the unjust enrichment claim. Can can your adversaries actions actually be unjust if they if if your adversary complied with or at least didn't violate federal trademark law and put another way to use your adversaries brief? Doesn't the unjust enrichment claim rise and fall with the trademark infringement? It doesn't. This is Pennsylvania law on just enrichment. The the essentially the the parallel to the the unjustness of this is the misappropriation under the contract. They were they were supposed to return the trademark to Mr. Schulte. And this is instead what they did. Once they acquired Collagen X, they kept telling Mr. Schulte, well, we're still looking into developing your product with your technology and your name. Don't worry. We're looking it over. Don't worry. Let's keep this going. Behind his back, however, the documents demonstrated that they already made a decision to in order to avoid paying him royalties for his technology. They were going to terminate the agreement, not use this technology, but keep the name. And then it and and they kept kept secret from him. They concealed from him that they actually had been starting to manufacture bottles. So he didn't even know until many, many months later that they were launching a product that was making use of his name on a product that didn't use his technology. That's what I think the jury found outrageous and why they found unjust enrichment here. The injustice is the misappropriation. And Pennsylvania doesn't require an equating with infringement. It doesn't require, as Galdermo argues, that there be a showing of confusion in the marketplace for it to be unjust. The injustice is is breaking what they had promised to do and concealing it from Mr. Yes, I have one question on the unjust enrichment claim on the statute of limitations. When the statute of limitations accrues, doesn't the approach taken here that it accrues upon whenever they're receiving benefits and therefore continues to accrue indefinitely? Convert an ordinary breach of contract claim into an unjust enrichment claim because the breach of contract was the failure to return the property trademark. Right. The unjust enrichment claim is based upon the failure to return the trademark. No, it's actually not. The the enrichment that's unjust was the profiting from the misuse of the misappropriated trademark. And the case law in Pennsylvania specifically addresses that. You know that that unjust enrichment does not require a showing of of infringement. The Harry Miller case that we cite, I'll give you an example where there is a claim of a misappropriation of a trade secret. And there, too, in that case was an argument about when that cause of action accrued. And the defendant argued that the cause of action accrued when they received the trade secret. But the court found that that the the unjust enrichment claim accrued when the defendant started using that trade secret to make a profit. So without I mean, let's look at this way. What if Galderma had kept the trademark, put it in a drawer and never used it? They would never have been unjustly enriched. So it wasn't until profits started coming in the door well within the four year period of time that the unjust enrichment claim accrued. OK, thank you. Thank you. I'm going to get you on rebuttal. Afternoon, Your Honors. Richard Rochford of Haines and Boone for the Apelli Cross Appellant. I'd like to introduce my colleagues, Joe Lawler and Ben Meshes and Nishant Patel from Galderma. Your Honor, I'd like to start on the trademark ownership point. And we agree with the way you characterized what the Lanham Act. I'm not I'm not characterizing a man. Oh, good question. You ask for you, too. I understand. In our view, and we believe this is what the Lanham Act requires. Common law trademark ownership rights are established through use of a mark of fixed to goods in commerce. Yeah. Well, you're your predecessor in interest. You mean your clients called Genix certainly seem to think there was a use in commerce because the press releases they put out immediately upon their deal with Mr. Gold put the world on notice by putting a trademark signal after the word restored. Right. Your Honor, are my advice to my clients is to put a trademark common law symbol next to the mark you're using the very first time you use it and let the world know you're you're claiming common law rights. Yeah, but they don't they don't say they're claiming common law rights. They say they are entering into a, quote, license for the technology known as restore a term trademark. In other words, it looks to all the world when you read that, like they're announcing to the world that we've got a license with a guy for his technology called restore a term trademark. I encourage you, Your Honor. I'd encourage you to read that again, because our reading of that is that I've read it. Many, many times. No, no. How do you get from their assertion to the world? We are licensing this this technology called restore a term trademark. How do you get from that to, hey, this is us coming up and claiming this right for the first time and not we're recognizing this, that there's a common law right in this. Our position is that that press release does not suggest that any common law rights have been created prior to that press release. That is, did our first year that a jury disagree with you? No, I think what happened with the jury is that they were not instructed that, according to the Lanham Act, the trademark rights are established for use of a mark affixed to goods and even granting. Let's say we agree with you on the press release, Your Honor. If we mistakenly believe that the point is, is that the public notice requirement of trademarks, the Lanham Act requires to allow someone to claim trademark rights to exclude others that they are in the marketplace using that mark on goods. Now, hold on just a minute. Is it not the case, isn't there case law, which, in fact, is in line with what Mr. Clark has described, where initial marketing efforts to the market you want to go to, including marking samples, taking them to trade shows, things like that, constitute use in commerce? No, Your Honor. What we've seen, actually, is the reverse of that. I'd cite the Duffy case for you, where the District of New Jersey, applying the controlling Lucent case in the circuit, said that Mr. Duffy's samples did not constitute use of commerce, was not enough to create use. Since this is a circumstance where, according to them, and the facts seem to bear them out, that there was a co-development agreement pursuant to which Mr. Scold would not be doing this on his own. It was specifically set up so that he would be working with Colgenex. Why doesn't he get the benefit of the use that your client was making because that was what was explicitly anticipated by their agreement? Why wouldn't Mr. Scold? In other words, your premise is that these are competing goods in the marketplace. You cite us to the natural footwear case, which is a concurrent use case, right? It's two products in the market, and that's why you ask about market penetration, and you say, if they're not really in the market, we're not going to credit them with being in the market, right? But this is a case where there's a contractual agreement pursuant to which the man who came up with the name, and which your client told the world was Restoraderm Trademark, said, okay, you guys are going to, I'm going to be working with you. Why isn't this like the Dobler's hybrid case where one party gets the benefit of a related party's efforts in commerce? That was not a Lanham Act case, first of all, Your Honor, and we think that it's different, and the Pennsylvania unfair competition claim was not upheld by the jury. But fundamentally, there is no product. Mr. Skuld concededly had no goods prior to Collagenix filing its trademark application in its own name in February of 2002, pursuant to the agreement that you read earlier, which says that Collagenix will be the exclusive owner, and we read that agreement, and have always read that agreement, not to be any kind of transfer, but a simple statement that we own this. There's nothing in there that says Mr. Skuld. When the district court denied your summary judgment ruling, because you asked summary judgment on this one, right, and you cited what I was citing to Mr. Clark, and decided that there was a material issue of fact here and it should go to the jury, what was the district court relying on? The district court seemed to be relying on this, that the facts presented by Mr. Skuld, his papers and other things, created some kind of common law, right, at least a fact issue that should go to the jury. Our position on that is that the district court was mistaken, because if you read Lucent, Lucent tells you you can only establish prior ownership if you use the mark in a way sufficiently public to identify or distinguish the marked goods. The case law requires marked goods. He didn't have that. So as to, I want to deal, though, with the incidental uses. First of all... And the record is quite clear at that. Does that matter? Because it was under Cologenic's banner. There's nothing about that work that associates Restoraderm with Mr. Skuld. Just a brief summary. Can you have it both ways? Can you say he didn't have any use because Cologenic's was the only one who used it first? And then say, ignore for purposes of commerce that he's prevented from doing something without Cologenic's. But when it comes to seeing him in the market doing stuff, then pay attention to the document, because that's the only reason he was allowed to do it. Is that inconsistent? No, it's not, Your Honor, because we didn't claim that we were creating any trademark rights out of those activities at the conference, where we held a focus group under the Cologenic's banner in which we asked Mr. Skuld to come with some samples that he claims, but there's no corroboration of that, said Restoraderm on them. There's no document anywhere that says Restoraderm. But the jury believed him, right? The jury believed them. The jury found against him. That's something we have to deal with. You're trying to deal with that like that's, yeah. No, I don't mean. There's a jury finding that he owns the mark. And there was something in front of the jury when they decided that. What was in front of the jury that made them say, oh? I believe it was the judge's jury instruction, which the judge decided it was not going to apply Lucent, was not going to apply that natural footwear test. It rejected our request for an instruction that said whatever prior use there is, it has to be deliberate, continuous, and consistent. Now, if my colleagues will forgive me because I have done too much here, but let's move to confusion. How can it be consistent to say that the very same mark, this is a word mark. We're not talking about stylized script or logo or something like this. We're talking about a word mark. The word is Restoraderm. A word mark which is identical to the mark that was registered in Collagenix's name and which is used on dermatological products is, how can that not as a matter of law be confusing? How is it that the district court was correct to deny an instruction that if you find a jury that Mr. there is a likelihood of confusion? Because you can't infringe something that doesn't exist. There's no way to apply the lab factors. You have the Galderma product, Cetaphil Restoraderm, and you have nothing on Mr. Schultz's side. All you have is a hypothetical, Your Honor. Okay. Where he says that someday. We're talking past each other, and I'm sorry to interrupt, but we're on the clock. So I realize that this is, and I hope you do too. I don't mean to be rude, but I got a bunch of questions for you, so I have to interrupt sometimes. Assume for the sake of discussion that the jury is properly instructed and it says, okay, he owns the mark. If he owns the mark and the mark he intends to use it for, this is a reverse confusion case. We got to deal with our Freedom Card case, our Freedom Card opinion. In that context, he is the little tiny junior user only wanting to get into the market. Why isn't there a likelihood of confusion, indeed a certainty of confusion, if the word mark is the same word to be used on the same kind of product? Where in that logical set of steps, which they present to me, are they an error? They're an error because we have no idea how to apply the lab factors. You can't just say that he has an intent. Mr. Skoll concedes that he has no product in the market. Every trademark case that I'm aware of involves products that are in front of the public that a court can analyze and say, is this too close? Are people likely to be confused? Here we have nothing. So is it your position, then, that somebody can appropriate a trademark and use it and thereby preclude that other party from entering the field? I mean, to me, that's the problem I'm having here with the questions that Judge Jordan has asked. I understand the question, Your Honor. The presumption there is that Mr. Skoll had established rights in the mark. Well, I think we have to go with that because that's what the jury found. Assuming that that was a proper finding, and we believe that it ignores the Lucent case. Please assume that it is a proper finding. Okay, assume that's a proper finding. Then the question is, what do you compare? You've got Mr. Skoll who tells you in his briefs he concedes he has no products in the market. How do you conduct an infringement analysis? You don't know what his product is going to look like. You don't know what market it's going to sell in. You don't know what his technology is because he was attempting to work with you on it. You also know that he wanted to use it on some other things, and you told him, don't use this mark. There was, in effect, a cease and desist. Don't get near this mark communication from your client to him, right? Our client, based on Calderma, purchased Collagenics. It purchased the trademark registration. It fully in good faith believed it owned the restorative trademark and was using that product. So back to your question around the best inference we can make, and we would have to guess at it, is that Mr. Skoll would introduce a product using his technology, similar to the Ceramax product that he introduced in 2016 that's in the record. That product is sold as a prescription product for $200. It also bears the mark LipoGrid, which is part of Mr. Skoll's early papers. Remember, Mr. Skoll didn't just use it. He can't use the mark. That's the point, right? I mean, when you say it bears the mark LipoGrid, his assertion is, I want to use the restorative mark. They're the Goliath threatening to crush me if I use my own mark. That was the whole pitch, and the jury said, outrageous, by Calderma. And the jury based that on a conclusion that we think is not supported under the law. You simply can't conduct a likelihood confusion analysis when you have no idea whether anyone in any marketplace is going to be confused when Mr. Skoll ultimately comes up with a product. Isn't there all the time analyses of bridge the gap discussions when you're doing? Sure. When products are in the marketplace. Okay. Assume Ceramax is on the market, and you distinguish it by saying, oh, that's a $200 pharmaceutical. Forget that. If he's selling dermatological products, and you know he wants to sell dermatological products because that's what he was working with your client on, isn't it fair to say, yeah, he wants to bridge the gap? He's been trying to bridge the gap, and that's one of the factors you look at. What's the likelihood that this guy is going to be going into a market where the other product is? He's not there yet, but he wants to be there. The law accounts for that, doesn't it? It only accounts for it when there is a product in the marketplace already in some market. And, Your Honor, the premise that somehow. Ceramax? What? Ceramax? Okay. So let's take Ceramax. It's a $200 prescription product that bears other marks. Mr. Skoll, if you look at what he did in 2001, he used four or five marks to describe his products. He filed applications intent to use in 2001, where he said, or 2010, after the communications with Galderma, where he wanted to use based on LipoGrid Restoraderm technology, LipoGrid Restoraderm. I don't think that anyone would conclude that those products are going to infringe when, Galderma is a product with the Cetaphil brand in big letters, and beneath it is a sub-brand, Restoraderm, on two of the 30 Cetaphil products that you can walk into Walmart and get for $8. If this was such a throwaway, if the Restoraderm was just a little tiny subscript and not really that important, couldn't this case have been settled a long time ago by just saying, hey, we like Cetaphil. You go ahead and be Restoraderm. Clearly, your client thinks this is worth something or we wouldn't be fighting about it, right? I can't get into settlement discussions, but that was, I can't say, Your Honor, but I appreciate the point. May I have just a minute to address the unjust enrichment? Sure, we can give you an extra minute. I'm sorry? Yes. Oh, thank you very much. To your point, first of all, Mr. Skoll equated the unjust enrichment claim to a misappropriation claim, which is not recognized when there's a trademark claim. You can't misappropriate a trademark. So on that basis, I think it falls through. And again, in terms of the statute of limitations, the case that Mr. Clark cites that relates to Harry Miller, we're fine with the court adopting the Harry Miller accrual approach in this case, which is when the product was first sold, that was the accrual date for purposes of the plaintiff's unjust enrichment claim in that case. And in this case, Galderma was selling its product in June of 2010. That first sale standard that is applied in Harry Miller, that's more than four years before the lawsuit was brought. So it's our position that that claim is part of our statute. Can you reconcile the jury's finding of no likelihood of confusion with its finding of unjust enrichment? Yes, Your Honor, because in looking at likelihood of confusion, the jury properly looked at what the evidence in the case was. And I think that position is entitled to considerable deference. They have the whole record of everything that Mr. Skold said he had done, how that applied to what Collagenics had done. And they realized, which I think matches up to common sense, that what Mr. Skold had been talking about in terms of this complicated medical product that had a moisturizing layer combined with a product that would pierce the skin and deliver an active substance, and what he had been talking about back in 2001 would not create confusion with someone buying in to buy a Cetaphil product in 2010 and later. And I think that was a very reasonable, practical decision by the jury that's well supported by the evidence. There's nothing here that says that that cries out and is somehow improper and unconscionable. And I appreciate that the court may have a view of Galderma's conduct. Galderma purchased Collagenics in 2008, and it has an agreement that says it owns the Restoraderm trademark going back to 2002. It has its application that it matured into a registration in its own name. What about that 2004? If my colleagues will indulge me, the 2004 agreement, which you've heard Mr. Clark say, well, that just wiped out that whole 2002 agreement. What's your response to that? Our position is that there was nothing in the 2004 agreement that related to the trademark. In fact, we submit a proof that the terms that related to the trademark had been withdrawn prior to. Reversion of goodwill. That's what they're pointing to, right? Maybe they're pointing to something else that I'm not aware of. And if you look at that provision that deals with the intellectual property assets, and it's the reversion of the goodwill in the intellectual property assets that are specifically described and do not include trademarks. Thank you very much. Thank you, counsel. Your Honor, there was evidence of actual confusion here. Mr. Skolk marketed the restorative name to the dermatology pharmaceutical segment of the marketplace. Yeah, and you lost on that, right? No, we didn't lose on that point, no. Well, you did. They said there was no likelihood of confusion. And this is why we think that the jury's finding that the use by Galderma was false and misleading cannot be harmonized with its ruling of no likelihood of confusion, and why the judge should have directed a verdict and later corrected that. Why isn't it that perfectly consistent with the judge instructing a jury that a false advertising claim under one section of Section 43 is different from a Lanham Act trademark infringement claim under a different section of Section 43? You're right, it's a different section, but the conclusion of the jury suggests that they found the use, and that's the way that the jury interrogatory was phrased, that the use by Galderma was false and misleading. It wasn't limited to just a particular kind of claim. It wasn't limited to just advertising. It was the use of the trademark by Galderma, and those two findings can't be reconciled, which is one of the reasons we think the weight of the evidence suggests that there should have been a finding directed of confusion or that it's so inconsistent that it requires a new trial on that particular point. But let me focus on – Mr. Stoll testified that there was at least one person within the industry that he was marketing to that said, when Cetaphil Restorederm came out, oh, I see that they're using your technology. Clearly, there's evidence of direct confusion, but yet there's more. Indeed, but I'll repeat. Now you're arguing confusion, and you lost on that in front of the jury. We're not here after they won on summary judgment. We're here after they won on that point at a trial with the jury. So how can you say that no rational juror could hear your client's comment about somebody came up to me at a conference and was confused, and yet say, in the face of other evidence, a full record, we just don't think there's going to be much in the way of consumer confusion? Well, I will concede that jury determinations are entitled to deference. But part of our argument here is to correct what we think is an error in the trial judge not directing a verdict on that issue and not correcting the jury's finding on that issue. So what we're left with is an inconsistent verdict. Let me remind you also in the LAP decision, they talked about not just existing use of the product, but going beyond future use of the product. And you were talking about what if Mr. Skoll wants to use this name in the future? And he testified that that's exactly what he did. And Jeffrey Day testified that he would have used it as well. And the LAP decision says the likelihood of expansion factor is pivotal in non-competing product cases. We're with you. We've read the LAP case. Would you respond to something that your opposing counsel said? Of course. He said that you've relied heavily on the 2004 agreement and said it effectively took 2002 out of it. He says when you look at the reversion provision in 2004, it talks about the reversion of intellectual property and goodwill. It's defined. The intellectual property is defined as the restorative technology and patents. The patents, not the trademarks. What's your response to that? Well, as I said before, Your Honor, that was an issue that was raised before the trial judge. Judge Bilstone granted judgment on the question of whether or not the 2002 agreement was still in effect. And she ruled no, it was superseded by the 2004. So when we went to trial, it was about the meaning of the 2004 agreement. Right, and I'm trying to get you to respond to their assertion that the 2004 agreement does not leave open the interpretation that the jury was allowed to find. Again, it's unambiguous in defining what was going back, and it wasn't trademarks. Well, the ambiguity, I would suggest, is whether or not trademarks were intended to be encompassed within the phrase goodwill. The trial court properly decided, well, that is a factual question. Testimony was given as to the intent of the parties with regard to that. And the jury came to the conclusion that, yes, it should have been given back. And therefore, the trademark is rightfully Mr. Scull's. So to the extent that we're honoring the jury's findings, that's one that we think the jury got right in this. And let me close, if I may, with with something that that's really not being focused on here. And that's. Given the jury's finding that Mr. Scull was the owner, given their finding that this is false and misleading use, given their finding that it was outrageous and giving the finding that that the use is unjust and unjustly enriching. There's a serious disconnect between the jury's verdict and what is happening out in the real world. To today's gold derma worldwide is still using the trademark. And we're left in a position of, although it's ours, we still can't use it. And our business partners are joint venture partners. And Mr. Scull is working with other pharmaceutical companies trying to develop this. They're not going to allow the use of that while this case is pending, which is one of the reasons we've been asking for injunctive relief and declaratory relief as well to give comfort so that Mr. Scull can actually start using his trademark as he has wanted to from the beginning and to give guidance to the patent and trademark office for the action that's still pending there to to shift the registration into Mr. Scull's name. If you don't have that, that's about it, counsel. Thank you. Thank you very much for your time. Thank you. We'll take the case under advisement. It's a very interesting case. And, you know, could you order a transcript? And the parties will split the cost. OK. Thank you. Thank you. We'll go off the record for a minute. We'd like to actually greet counsel at sidebar in a more informal way.